Argued February 23, affirmed June 15, 1972

COAST LAUNDRY, INC., *Appellant, v.*
LINCOLN CITY (No. 29882),
*Respondent.*

497 P2d 1224

*George M. Joseph,* Portland, argued the cause for appellant. With him on the briefs were Bruce Williams, William B. Wyllie, and Williams, Skopil, Miller, Beck & Wyllie, Salem.

*Edward H. Warren,* Portland, argued the cause for respondent. On the brief were Hershiser, Mitchell & Warren, Portland.

Before Schwab, Chief Judge, and Fort and Thornton, Judges.

THORNTON, J.

Plaintiff brought action to recover damages to its laundry business allegedly sustained because the water supplied plaintiff by defendant city contained particles of tar.

The action was brought in successive counts upon alternative theories of negligence, breach of contract, strict liability, breach of express warranty and breach of implied warranty of fitness for a particular purpose. The trial judge withdrew from the jury all issues except that of negligence. The jury returned a verdict for defendant.

Plaintiff appeals assigning as error the action of the trial judge in withdrawing from the jury's consideration the issues of warranties of merchantability and fitness for a particular purpose.

Defendant cross-appeals assigning as error (1) the court's refusal to sustain defendant's objection to, and refusal to strike testimony of, witness Kenneth Buchanan, a stockholder and director of plaintiff corporation, on the question of damages and (2) the court's refusal to grant defendant's motions of a directed verdict on damages.

Plaintiff corporation was formed in 1966 for the purpose of establishing and operating a commercial laundry to provide service to motels and commercial lodging units in and around Lincoln City. Prior to the construction of the laundry a representative of plaintiff met with the defendant's director of public works to discuss the quality and quantity of water that defendant could provide and that would be necessary for plaintiff's planned operation. The parties apparently did not enter into a formal written contract for the delivery and sale of water. Defendant's public

works' director informed plaintiff's representative of the frequent turbidity, the various impurities present in defendant's water supply and of the likelihood that plaintiff frequently would have to use discolored water. Defendant's representative did not attempt to warrant or guarantee the fitness of the water supply. He did not mention the possibility of tar particles.

Plaintiff began operation in the spring of 1967 and while the annual sales doubled from approximately $15,000 in 1967 to $30,000 in 1968, and $31,000 in 1969, the business operated at a net loss of $17,434 in 1967, $22,339 in 1968, and $24,883 in 1969, according to plaintiff's tax returns.

According to plaintiff it was not until March 10, 1969, that the tar particles commenced to present a serious problem, although defendant offered some testimony that specks of tar had appeared on the laundry in the early months of plaintiff's operation. Plaintiff's evidence on this was substantially as follows: That from March 10, 1969, these particles not only stained some of the white flat goods, sheets and pillow cases, but also formed a black residue on machinery that came in contact with the cleaned laundry; that these particles continued to appear in the water until at least September 18, 1969, and were actually pieces of tar that came from the lining of certain defective pipe used by defendant in a portion of its water system.

After several conferences between representatives of plaintiff and defendant, plaintiff installed a filter. Notwithstanding, the tar in the water plugged the filter causing it to rupture. Particles of tar continued to plague plaintiff's laundry operation. Plaintiff's personnel frequently had to rewash and attempt

to remove the tar stains from the white goods. On several occasions they shut down the plant to clean the tar residue from the machinery. Plaintiff contends that the tar problem caused it to lose business, suffer a bad reputation and become the target for many complaints from its clientele. From time to time as plaintiff allegedly incurred expense by reason of particles of tar coming through defendant's lines, it prepared and submitted to defendant statements of those claims. Those statements were received in evidence at trial without objection. On the other hand, defendant's evidence was that plaintiff's claimed loss of business was due rather to other causes, including faulty equipment, inept workmanship, inadequate service and discolored water.

On September 18, 1969, plaintiff, believing that it could no longer continue to wash linen in the Lincoln City area, began to serve its customers by trucking the laundry to Salem to have it washed and then trucked back to the customers. On November 8, 1969, plaintiff concluded that it could not profitably operate its laundry business in this manner and decided to cease its operation completely.

The central question before us is: Was defendant, in supplying water to plaintiff, subject to the provisions of the Uniform Commercial Code (UCC) which establish certain implied warranties in sales of goods by a merchant in commercial transactions?

Plaintiff bases its contention regarding the applicability of the UCC on the following propositions:

(1) "The sale and supply of water by a municipality is a sale of goods by a merchant subject to ORS 72.3140 and ORS 72.3150."

(2) "The sale and supply of water by a munici-

pality is a proprietary function and as such subjects the municipality to the same obligations that the law imposes upon a private corporation or individual similarly engaged."

(3) "Whether the implied warranties of merchantability and fitness for a particular purpose were breached by the defendant were questions of fact for the jury."

■ Under ORS 537.110 all water within the state from all sources of water supply belongs to the public. However, after water has been appropriated and diverted from natural streams into artificial works it becomes personal property. *Vaughan v. Kolb et al.*, 130 Or 506, 280 P 518 (1929).

■■ We agree with plaintiff that the construction, operation and maintenance of waterworks, gas works and lighting plants by an Oregon municipal corporation for the benefit and convenience of its inhabitants constitute the exercise of private and proprietary powers, *Butler v. City of McMinnville*, 126 Or 56, 268 P 760, 59 ALR 381 (1928), *Twohy Bros. Co. v. Ochoco Irr. Dist. et al.*, 108 Or 1, 210 P 873, 216 P 189 (1923), and that a municipal corporation engaged in the business of supplying water to its inhabitants is engaged in an undertaking of a private nature and is generally liable therein for breach of contract or for negligence as a private corporation would be. *Pacific Paper Co. v. Portland*, 68 Or 120, 135 P 871 (1913); *Esberg Cigar Co. v. Portland*, 34 Or 282, 55 P 961 (1899).

■ We next consider whether there are implied warranties of merchantability and fitness for a particular purpose in connection with the sale and supply of water. ORS 449.210,① cited and relied upon by de-

---

① ORS 449.210:

"In the interest of the public health, every person, com-

fendant, is by its express terms a public health protection provision and is not applicable to the determination of the respective rights and duties of the parties in the circumstances involved here.

Cited by both sides is *Canavan v. City of Mechanicville*, 229 NY 473, 128 NE 882, 13 ALR 1123 (1920). In *Canavan* plaintiff became ill when water supplied by defendant became contaminated with typhus. Plaintiff instituted an action against the defendant on dual theories of negligence and implied warranty of quality. The court held, in a 4 to 3 decision that (1) the sale of water by a municipality was a "sale of goods" within the meaning of the New York version of the Uniform Sales Act (USA), but that (2) no such warranty existed as to suppliers of water. The majority opinion stated:

"* * * The question we are to determine is whether or not a warranty was so created.

"* * * The conclusions of the text writers and the decisions of the courts, apart from those in this case, have been uniformly that a private water company or a municipality is not an insurer nor liable as a guarantor, of the quality of the water it furnishes to its customers in the customary means of pipes and faucets, and cannot be held liable for injuries caused by impure water furnished by it unless it knew or ought to have known of the impurity; its duty is that of exercising reasonable and commensurate care and diligence in providing an

pany or municipal corporation or agency thereof selling water to the public for drinking and household purposes shall take every reasonable precaution to protect from contamination and assure the healthfulness of such water. Any provisions in any charter granted prior to March 1, 1919, to such persons, companies or municipal corporations in conflict with this section and ORS 449.215 are repealed."

adequate supply of wholesome water at all times. [Citing cases.]" 229 NY at 476-77.

The dissent (three judges) reached the opposite conclusion, namely, that there was an implied warranty under the facts of the case.

As already noted, *Canavan* was decided under the USA. Under the USA the term "goods" was defined:

" 'Goods' include all chattels personal other than things in action and money * * *."

The above language is identical with the Oregon version of the USA (ORS 75.760) as it existed prior to its repeal and replacement by the UCC in this state.

Under the UCC—Sales—this section (UCC § 2-105) was completely rewritten. This is now ORS 72.1050. The following explanation of this change appears in the Official Comment (1 Uniform Laws Ann 79, 80, § 2-105 (1968)):

"Purposes of Changes and New Matter:

"1. Subsection (1) on 'goods': The phraseology of the prior uniform statutory provision has been changed so that:

"The definition of goods is based on the concept of movability and the term 'chattels personal' is not used. *It is not intended to deal with things which are not fairly identifiable as movables before the contract is performed.*" (Emphasis supplied.)

■ ■ While we have found decisions holding that suppliers of electric power, natural gas and bottled fuel gas may be held liable to their customers on the theory of breach of express or implied contract[②] or breach of

---

[②] Annotation, 4 ALR3d 605-607 (1965). *See also,* Annotation, 13 ALR2d 1233-1236 (1950), and 13-18 ALR2d Later Case Service 1233-1236 (1965).

implied warranty,[9] we have been cited to no authority nor have we found any holding there is an express or implied warranty of merchantability or fitness for a particular purpose in connection with the sale and supply of water. In 56 Am Jur 983-84, Waterworks § 79, the following rule is given, which we adopt:

> "* * * [A] municipal corporation in furnishing for compensation a supply of water to its inhabitants is not an insurer, or liable as guarantor of the quality of the water it furnishes to its customers, and cannot be held liable for injuries caused by impure water furnished by it unless it knew or ought to have known of the impurity; but it may be held liable for injuries resulting from its negligence in permitting its water supply to become contaminated or polluted, thereby causing illness or an epidemic. Its duty is that of exercising reasonable commensurate care and diligence in providing an adequate supply of water at all times * * *."

In view of our decision it is not necessary for us to consider defendant's assignments of error on its cross-appeal.

Affirmed.

---

[9] Buckeye Union Fire Ins. Co. v. Detroit Edison Co., 38 Mich App 325, 196 NW2d 316 (1972); Murphy v. Petrolane-Wyoming Gas Service, 468 P2d 969 (Wyo 1970); Gardiner, Aplnt. v. Phila. Gas Works., 413 Pa 415, 197 A2d 612 (1964); Balthazor v. B & B Boiler & Supply Co., 169 Kan 188, 217 P2d 906 (1950).